IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03328-WYD-KLM

SALLY RUMPF and LOUIS RUMPF,

      Plaintiffs,

v.

SUNLIGHT, INC.,

      Defendant.

---

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Defendant Sunlight, Inc. ("Sunlight"), through its attorneys, Davis Graham & Stubbs LLP, for its Motion for Summary Judgment, hereby states:

## <u>INTRODUCTION</u>

This is a ski accident lawsuit, in which Plaintiff Sally Rumpf ("Ms. Rumpf") alleges that she was injured while attempting to board the Segundo chairlift at Sunlight, and she brings claims in spite of the releases to which she agreed, her admission that she failed to stop at the "wait here" bar as required, and her acknowledgment that she failed to look to the center pole of the chairlift, in spite of the instructions to do so.  The claims of Ms. Rumpf and her husband, Plaintiff Louis Rumpf ("Mr. Rumpf," collectively "Plaintiffs"), fail as a matter of law for three reasons.  First, their claims are barred by two separate releases to which Ms. Rumpf agreed.  Second, although their claims must necessarily rely upon expert proof, Plaintiffs have failed to disclose any expert witnesses on any aspect of Sunlight's liability.  Third, with regards to Sunlight's affirmative defense of comparative fault, in order for Plaintiffs to survive summary

judgment they must rebut the undisputed evidence of Ms. Rumpf's negligence *per se* through expert testimony, which they failed to provide.

## MOVANT'S STATEMENT OF MATERIAL FACTS

**I.      Background on Plaintiffs and Their Trip**

1.      Plaintiffs, California residents, (Sch. Order at 4 ¶ 1 (Dkt. No. 18)), travelled to Glenwood Springs, Colorado on December 24, 2012, to visit family and go skiing.  (S. Rumpf Dep. at 79:5-20, Ex. 1.)

2.      On December 27, 2012, Plaintiffs went to Sunlight to go skiing.  (Sch. Order at 4 ¶¶ 3-4 (Dkt. No. 18).)

3.      Sunlight is a ski resort near Glenwood Springs, Colorado.  (Terry Decl. ¶ 6; *see also* Sch. Order at 4 ¶ 2 (Dkt. No. 18).)

**II.     The Releases to Which Ms. Rumpf Agreed**

4.      Before Plaintiffs began skiing on December 27, 2012, they rented ski equipment from Sunlight and purchased lift tickets.  (S. Rumpf Dep. at 85:15-19, 102:18-21.)

5.      Ms. Rumpf executed a release when she rented ski equipment from Sunlight.  (Ex. 2; *see also* S. Rumpf Dep. at 97:8-17; Terry Decl. ¶ 8.)

6.      Sunlight owns and operates the rental shop from which Ms. Rumpf rented equipment. (Terry Decl. ¶ 7.)

7.      The release Ms. Rumpf executed (hereafter "Liability Release Agreement") provides in pertinent part:

> I understand that the sports of skiing, snowboarding, skiboarding, snowshoeing and other sports (collectively "RECREATIONAL SNOW SPORTS") involve inherent and other risks of **INJURY** and **DEATH**.  **I voluntarily agree to expressly assume all risks of injury or death** that may result from these RECREATIONAL SNOW SPORTS, or which relate in any way to the use of this equipment.

2

\*     \*     \*

**I AGREE TO RELEASE AND HOLD HARMLESS the equipment rental facility, its employees, owners, affiliates, agents, officers, directors, and the equipment manufacturers and distributors and their successors in interest (collectively "PROVIDERS"), from all liability for injury, death, property loss and damage which results from the equipment user's participation in the RECREATIONAL SNOW SPORTS for which the equipment is provided, or which is related in any way to the use of this equipment, including all liability which results from the NEGLIGENCE of PROVIDERS, or any other person or cause.**

I further agree to defend and indemnify PROVIDERS for any loss or damage, including any that results from claims or lawsuits for personal injury, death, and property loss and damage related in any way to the use of this equipment.

This agreement is governed by the applicable law of this state or province.  If any provision of this agreement is determined to be unenforceable, all other provisions shall be given full force and effect.

**I THE UNDERSIGNED, HAVE READ AND UNDERSTAND THIS EQUIPMENT RENTAL & LIABILITY RELEASE AGREEMENT.**

 (Ex. 2 (emphasis in original); S. Rumpf Dep. at 97:8-17, 99:2-10 (identifying the agreement that she signed).)

8.      Mr. Rumpf executed the same release.  (Terry Decl. ¶¶ 9-10; Ex. 3.)

9.      Ms. Rumpf agreed that she read and understood this Liability Release Agreement.  (S. Rumpf Dep. at 99:8-10; *see also id.* at 99:11-100:11, 101:11-102:17.)

10.      On the release language of the Liability Release Agreement, Ms. Rumpf testified as follows:

> Q.  . . . it says, in caps and bold, "I Agree to Release and Hold Harmless the equipment rental facility, its employees, owners, affiliates, agents, officers, directors, and the equipment manufacturers and distributors and their successors in interest (collectively 'Providers'), from all liability for injury, death, property loss and damage which results from the equipment user's participation in the Recreational Snow Sports for which the equipment is provided . . . ."  Do you see that?
> A.  Yes, sir.
> Q.  Did I read that accurately?
> A.  Yes.

3

> Q.  Okay.  And this is in bold?
> A.  Yes.
> Q.  With certain parts in caps?
> A.  Yes.
> Q.  Okay.  And you agreed to that release and hold harmless, correct?
> A.  Yes.

(*Id*. at 101:11-102:8.)

11.     Ms. Rumpf also agreed that she read and was bound to the release language on the ski lift

ticket ("Lift Ticket Agreement").  (*Id*. at 72:17-23, 106:6-109:7; *see also* Ex. 4.)

12.     Specifically, Ms. Rumpf testified that she read the language on the Lift Ticket

Agreement.  (S. Rumpf Dep. at 72:17-23; *see also id*. at 106:6-9.)

13.     After providing the statutory warning, the release on the Lift Ticket Agreement stated in

pertinent part:

> Holder understands that he/she is responsible for using the ski area safely and for
> having the physical dexterity to safely load, ride and unload the lifts.  Holder
> agrees to read and understand all signage and instructions and agrees to comply
> with them.  Holder understands that he/she must control his/her speed and course
> at all times and maintain a proper lookout.  Holder understands that snowmobiles,
> snowcats, and snowmaking may be encountered at any time.  In consideration of
> using the premises, Holder agrees to **ASSUME ALL RISKS** associated with the
> activities and to **HOLD HARMLESS** the Ski Area and its representatives for all
> claims for injury to person or property.  Holder agrees that any and all disputes
> between Holder and the Ski Area regarding an alleged incident shall be governed
> by **COLORADO LAW and EXCLUSIVE JURISDICTION** shall be in the
> State or Federal Courts of the State of Colorado. …

(Ex. 4 (emphasis in original); *see also* S. Rumpf Dep. at 107:9-109:7 (agreeing to each of the

above sentences).)[1]

---

[1] At the time Ms. Rumpf was deposed, she had yet to produce the actual lift ticket in her
possession.  At the deposition, an exemplar lift ticket was used, which contains the exact same
language as Ms. Rumpf's ticket.  (Terry Decl. ¶ 11; *see also* S. Rumpf Dep. at 103:16-104:9
(providing background).)  Ms. Rumpf subsequently produced an image of her actual lift ticket,
identical on the pertinent language in the exemplar used at the deposition.  (Terry Decl. ¶¶ 11-12;
Ex. 5.)

14.     Ms. Rumpf testified that she agreed to each and every sentence of the Lift Ticket

Agreement.  (S. Rumpf Dep. at 106:10-109:7.)

15.     By way of example, with regards to the hold harmless provision, Ms. Rumpf testified as

follows:

> Q.  The next sentence, "In consideration of using the premises, Holder agrees to
> Assume All Risks associated with the activities and to Hold Harmless the Ski
> Area and its representatives for all claims for injury to person or property."  Do
> you see that?
> A.  Yes.
> Q.  Okay.  And you agreed to that?
> A.  Yes, sir.

(*Id*. at 108:12-19.)

## III.     Plaintiffs' Morning Ski Runs and the Tercero Chairlift

16.     For context on this incident, after getting their lift tickets and rental gear, Plaintiffs took

multiple ski runs on Sunlight's easiest terrain accessed by the Tercero chairlift.  (*Id*. at 87:1-4,

87:15-88:5; Terry Decl. ¶ 13.)

17.     The Tercero chairlift is Sunlight's easiest chairlift, services Sunlight's easiest terrain, and

has a sign stating that "THIS LIFT SERVICES EASIEST, MORE DIFFICULT, [and]

FREESTYLE TERRAIN."  (Terry Decl. ¶ 14.)

18.     The Tercero chairlift is an outside bale, triple chair lift with a fixed grip – meaning that

the bales that connect the chair component of the chairlift to the haul rope are on the outside of

the chair component, the chairlift holds up to a maximum of three skiers, and the chairlift's grips

remain continuously attached to the haul rope.  (*Id*. ¶ 15.)

19.     Unlike Sunlight's other two chairlifts, the Tercero chairlift operates at approximately 350

feet per minute.  (*Id*. ¶ 16.)

20.    It operates slower than the other chairlifts because Tercero is Sunlight's beginner

chairlift.  Under the pertinent ANSI standards, the maximum speed for a fixed grip triple chairlift

is 500 feet per minute, much faster than Tercero.  (Terry Decl. ¶ 16; Stoddard Decl. ¶ 8 (citing

ANSI B77.1-2011 4.1.1.2).)[2]

21.    After a break around the lunch hour, Plaintiffs returned and took one more ski run via the

Tercero chairlift before travelling to the Segundo chairlift.  (S. Rumpf Dep. at 90:9-14, 91:20-

92:1; *see also id.* at 91:3-9 (context on testimony referring to lift numbers as opposed to names).)

22.    The incident occurred on the Segundo chairlift, which was the first time Plaintiffs

attempted to ride any chairlift at Sunlight other than the Tercero beginner chairlift.  (*Id*. at 87:11-

14, 88:6-16.)

**IV.    The Segundo Chairlift, Its Operation, and Its Signage**

23.    The Segundo chairlift is not a beginner lift, as Ms. Rumpf acknowledges.  (*Id*. at 89:14-

17.)

24.    Sunlight's signage of the Segundo lift complied with ANSI standards.  (Stoddard Decl. ¶

7.)

25.    Unlike the Tercero chairlift, the Segundo Chairlift had a sign at the time that stated:

"THIS LIFT SERVICES MORE DIFFICULT, [and] MOST DIFFICULT TERRAIN."  (Terry

Decl. ¶ 17; S. Rumpf Dep. at 144:4-7.)

26.    The sign did not say that the lift serviced beginner terrain (S. Rumpf Dep. at 144:4-10),

and Ms. Rumpf read this sign.  (*Id*. at 72:8-10, 142:14-17.)

---

[2] For context, ANSI B77.1 is the American National Standard for Passenger Ropeways – Aerial
Tramways, Aerial Lifts, Surface Lifts, Tows and Conveyors – Safety Requirements.  ANSI
B77.1, which sets the standards for ski lifts, is followed in the State of Colorado.  *See* C.R.S. §
25-5-704(1)(a); 3 CCR 718-1, Rule 0.1.

27.     The Segundo chairlift is a center pole, double chair lift with a fixed grip – meaning that the bale/pole that connects the chair component to the haul rope is in the middle of the chair component, i.e., between the two seats – the chairlift holds up to a maximum of two skiers, and the chairlift's grips remain continuously attached to the haul rope.  (Terry Decl. ¶ 18.)

28.     The Segundo chairlift, not being primarily a beginner chairlift, operates at a much faster speed – approximately 500 feet per minute.  (*Id.* ¶ 19.)

29.     Under the pertinent ANSI standards, the maximum speed for a fixed grip double chairlift such as the Segundo chairlift is 550 feet per minute (*i.e.,* 50 feet faster than the Segundo lift operates).  (Stoddard Decl. ¶ 9 (citing ANSI B77.1-2011 4.1.1.2).)

30.     Under the pertinent ANSI standard, only one lift personnel is required at the base of the ski lift, yet Sunlight had two personnel and a ticket checker at the base of the Segundo chairlift.  (Terry Decl. ¶ 20; Stoddard Decl. ¶ 10; Light Dep. at 20:21-21:8, Ex. 6.)

31.     The signs at the lift stated: "CENTER POLE CHAIR LOOK TO THE INSIDE."  (Terry Decl. ¶ 21; *see also* S. Rumpf Dep. at 144:23-145:9.)

32.     Ms. Rumpf read this sign.  (S. Rumpf Dep. at 72:8-10, 142:14-17.)

**V.     The Incident**

33.     Skiers are supposed to stop at the wait here sign/bar.  (*Id.* at 141:2-4, 284:3-6; *see also* Terry Decl. ¶¶ 22-23.)

34.     According to her testimony, Ms. Rumpf did not stop at the wait here bar, rather, she skied well past the wait here bar.  (S. Rumpf Dep. at 284:3-6, Ex. 1; L. Rumpf Dep. at 115:18-20, 116:17-117:7, Ex. 7; *see also id.* at 113:14-16.).)

35.     Specifically, according to both Ms. Rumpf and Mr. Rumpf's testimony, she skied over four and a half feet beyond the wait here sign before stopping.  (S. Rumpf Dep. at 147:17-24, 152:23-153:3, 154:3-9; L. Rumpf Dep. at 116:17-117:7.)

36.     With Ms. Rumpf four and a half feet beyond where she was supposed to wait, one (or more) of Sunlight's employees encouraged her and Mr. Rumpf to go to the load here bar to get on the lift.  (S. Rumpf Dep. at 161:21-162:5; *see also* N. Montgomery Dep. at 20:15-25, Ex. 8.)

37.     The only expert evidence in this case is that encouraging Ms. Rumpf to go to the load here bar was the proper operational decision under the circumstance.  (Stoddard Decl. ¶¶ 13-14; Terry Decl. ¶ 24.)

38.     Similarly, at this point there was insufficient time to slow the ski lift.  (Terry Dep. at 43:7-13, Ex. 9.)

39.     And, asking a skier to back up under these circumstances is not practical.  (*Id.* at 26:4-13, 33:3-7; 41:24-42:2.)

40.     Ms. Rumpf made it to the load here sign.  (S. Rumpf. Dep. at 164:2-4; *see also id.* at 165:19-22.)

41.     When she got to the load here sign, contrary to the signage she read that instructed her to look to the inside of the center pole lift, (*see* MSMF ¶ 31, above),[3] she looked straight ahead, (S. Rumpf Dep. at 171:6-15), or a bit to the right (i.e., to the outside).  (*Id.* at 170:8-21; L. Rumpf Dep. at 129:12-15; *see also* S. Rumpf at 147:17-24 (explaining Mr. Rumpf was on the left side and Ms. Rumpf was on the right side).)

42.     As Ms. Rumpf testified:

---

[3] All references to "MSMF" throughout this motion refer to "Movant's Statement of Material Facts."

> Q.   Okay.  You're supposed to stop at the "Wait Here" sign, but you didn't stop
> at the "Wait Here" sign.  You passed it, correct?
> A.   Yes.
> Q.   And you were supposed to look in towards the center pole, but you didn't
> look in towards the center pole, correct?
> A.   Yes.

(S. Rumpf Dep. at 284:3-10.)

43.      As such, the center pole lift hit Ms. Rumpf's left scapula (i.e., the left should blade), (*Id.* at 170:8-21), and she fell sustaining a shoulder injury.  (*Id.* at 186:6-25.)

44.      The only expert testimony in this case is that had Ms. Rumpf looked to the center pole as instructed, the accident would not have occurred.  (Terry Decl. ¶ 25; Stoddard Decl. ¶ 15.)

## VI.      Procedural Background and Plaintiffs' Lack of Standard of Care Expert Disclosures

45.      Plaintiffs filed this lawsuit on December 9, 2014, setting forth three claims – negligence, negligence per se, and loss of consortium.  (Compl., Dkt. No. 1.)

46.      Affirmative expert disclosures were due by August 17, 2015, rebuttal expert disclosures were due by September 15, 2015, and the discovery cut-off was October 8, 2015.  (Dkt. No. 37.)

47.      In spite of stating in the scheduling order that the anticipated fields of expert testimony would be on both "liability" and "industry practice," (Dkt. No. 18 at 7), Plaintiffs have never disclosed any experts involving standard of care, lift operations, or skiing.  (*See* Pl.'s Initial Rule 26(a)(2)(A) and (C) Expert Disclosures, Ex. 10; Lipp Decl. ¶¶ 2-3.)

48.      And, Plaintiffs both concede they have never worked in lift operations and are not experts in lift operations.  (S. Rumpf Dep. at 73:3-5; 74:4-11; L. Rumpf Dep. at 47:12-23.)

49.      Plaintiffs only expert disclosures, which they served on August 3, 2015, listed three non-specially retained treating physicians.  (Pl.'s Initial Rule 26(a)(2)(A) and (C) Expert Disclosures, Ex. 10; Lipp Decl. ¶¶ 2-3.)

50.     Sunlight made its affirmative expert disclosures on August 17, 2015, and disclosed (1) Chris Stoddard (specially retained), the current chairman of both ANSI B77.1's committee on ski lift operations and committee on signage, to address, among other things, lift operations and signage issues,  (2) Ross Terry (non-specially retained), its assistant general manager and designated agent for the Colorado Passenger Tramway Board, to address, among other things, Plaintiffs' fault for the accident and how Sunlight met and exceeded the standards for lift operations, and (3) Joe Sims (non-specially retained), its ski school manager, to address, among other things, Plaintiffs' skiing ability and decision to ride the Segundo lift.  (Defendant Sunlight, Inc.'s Affirmative Expert Disclosures, Ex. 11; *see also* Lipp Decl. ¶ 2.)

51.     The deadlines for expert disclosures have long since passed and discovery is now closed. (*See* Dkt. No. 37.)

## STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *Koch v. Shell Oil Co.,* 52 F.3d 878, 880 (10th Cir. 1995).  In order to obtain summary judgment, a defendant that does not bear the burden of persuasion at trial need not negate the plaintiff's claim.  *Thom v. Bristol–Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003).  Instead, the defendant's burden may be met by showing that there is no evidence to support the plaintiff's case.  *Id.*  If this initial burden is met, the plaintiff must go beyond the pleadings and set forth specific facts that would be admissible at trial from which a rational trier of fact could find for the plaintiff.  *Id.*  Summary judgment should be granted "against a party who fails to make a showing sufficient to establish . . . an element essential to that party's case."  *Celotex Corp. v. Catrett.,* 477 U.S. 317, 322, 106 S.Ct. 2548 (1986).

## ANALYSIS

**I.     PLAINTIFFS' HAVE RELEASED ALL CLAIMS AGAINST SUNLIGHT**

Ms. Rumpf released her claims against Sunlight both with the Liability Release

Agreement and with the Lift Ticket Agreement.  She has admitted that she read and agreed to the

pertinent language in both Agreements.  (MSMF ¶¶ 9-15.)  As a matter of law, therefore, all of

Plaintiffs' claims must be dismissed.

The determination of the validity of a release (also called a waiver or an exculpatory

agreement), such as the Liability Release Agreement and Lift Ticket Agreement here, is an issue

of law for the Court that can be resolved in a summary judgment.  *E.g., B & B Livery Inc. v.*

*Riehl,* 960 P.2d 134, 136 (Colo. 1998) ("The determination of the sufficiency and validity of an

exculpatory agreement is a question of law for the court to determine.").  Exculpatory

agreements have been upheld by Colorado federal and state courts in numerous similar

circumstances, and bar Plaintiffs' claims in this case.  *E.g., Bauer v. Aspen Highlands Skiing*

*Corp.*, 788 F. Supp. 472, 474-75 (D. Colo. 1992) (exculpatory agreement barred skier's claims

against ski area and binding manufacturer from a ski accident); *Chadwick v. Colt Ross Outfitters,*

*Inc.*, 100 P.3d 465 (Colo. 2004) (exculpatory agreement barred hunter's claims against hunting

trip organizer based upon injuries he sustained when he was thrown off a mule); *B & B Livery,*

960 P.2d 134 (exculpatory agreement barred horseback rider's claims against a livery after she

fell from a horse rented by the livery); *Heil Valley Ranch, Inc. v. Simkin*, 784 P.2d 781 (Colo.

1989) (exculpatory agreement barred horseback rider's claims against a ranch based upon

injuries she sustained when a horse fell onto her); *Jones v. Dressel*, 623 P.2d 370 (Colo. 1981)

(exculpatory agreement barred skydiver's lawsuit against an air service for injuries he suffered

when the plane in which he was riding crashed); *Forman v. Brown*, 944 P.2d 559 (Colo. App.

1996) (exculpatory agreement barred white water rafting participant from suing for injury she

sustained while swimming during her river trip); *accord Robinette v. Aspen Skiing Co.*, 363 F.

App'x 547, 548 (10th Cir. 2010) (unpublished) (affirming summary judgment on skier's claims

against ski area over collision with snowmobile based upon exculpatory agreement).

Exculpatory agreements are just as valid with regards to premises liability claims as they are to

negligence claims. *Mincin v. Vail Holdings, Inc.*, 308 F.3d 1105, 1110-11 (10th Cir. 2002)

(affirming summary judgment in favor of landowner and bicycle renter based upon an

exculpatory clause under Colorado law).

> In determining whether an exculpatory agreement is valid, there
> are four factors which a court must consider:  (1) the existence of a
> duty to the public; (2) the nature of the service performed; (3)
> whether the contract was fairly entered into; and (4) whether the
> intention of the parties is expressed in clear and unambiguous
> language.

*Jones*, 623 P.2d at 376.  Each factor is addressed, in turn, below:

**Existence of a duty to the public**.  With regards to the first factor, recreational activities,

such as skiing, do not involve a public duty.  *E.g.*, *id.* (no public duty in skydiving facilities);

*Mincin*, 308 F.3d at 1110 (collecting cases and finding that "a recreational activity does not

involve a public duty").  As the *Bauer* case explained,

> In *Jones*, the court made it clear that, for an exculpatory agreement to fail under
> the first factor, the party seeking exculpation must be engaged in providing a
> service of great importance to the public, which is often a matter of practical
> necessity to some members of the public.  It is the essential nature of the service
> that gives the party seeking exculpation an unfair bargaining advantage and
> results in the contract running afoul of public policy.
> The service here is recreational.  <u>Although skiing is a recreational activity enjoyed
> by many, by definition and common sense, it is neither a matter of great public
> importance nor a matter of practical necessity.  Therefore, there is no public duty
> that prevents enforcement of this agreement.</u>

*Bauer*, 788 F. Supp. at 474 (internal citations omitted; emphasis added).

**Nature of the service performed**.  With regards to the second factor, the nature of the

service provided, recreational activities such as skiing are not the type of activities in which

courts find exculpatory agreements unenforceable. *Mincin*, 308 F.3d at 1111 ("mountain biking is not an essential activity"); *Bauer*, 788 F. Supp. at 475 (D. Colo. 1992) (skiing and ski equipment "were not essential"); *Jones*, 623 P.2d at 377-78 (skydiving "was not an essential service").

**Whether Contract Fairly Entered Into**.  With regards to the third factor, whether the contract was fairly entered into, since recreational activities are not essential services, Sunlight "did not possess a decisive advantage of bargaining strength."  *Jones*, 623 P.2d at 377-78; *accord Mincin*, 308 F.3d at 1111 (since "mountain biking is not an essential activity," the plaintiff "did not enter into the contract from an inferior bargaining position"); *Bauer*, 788 F. Supp. at 475 (as skiing is recreational, ski area and binding manufacturer "did not enjoy an unfair bargaining advantage" even though all places in the area "required the same release").

**Clear and Unambiguous Language**.  With regards to the fourth factor, whether the intention of the parties is expressed in clear and unambiguous language, the language of the Liability Release Agreement far exceeds release language found valid by the Colorado Supreme Court in prior cases.  In *Heil Valley Ranch*, 784 P.2d 781, the Colorado Supreme Court affirmed summary judgment in favor of a defendant stable-owner on the basis of a release signed by an injured rider.  Notwithstanding the absence of any reference to the negligence of the stable in the release, the Court upheld the release finding that the language of the release which referred to any injuries "incurred in said activities" was sufficiently clear.  *Id*. at 782.  The Court emphasized that no specific or magic terms need to be used to effect a release so long as a reasonable interpretation of the document reveals an intent to insulate the released party from his own negligence.  *Id.*

Here, the Liability Release Agreement provides that specifically asserts that the release covers "**all liability which results from the NEGLIGENCE of PROVIDERS, or any other person or cause.**" (MSMF ¶ 7; Ex. 2 (emphasis in original).)  As it is undisputed that Sunlight is the "owner" under the Liability Release Agreement, (MSMF ¶ 6), and thus is a "PROVIDER" under the Liability Release Agreement, (Ex. 2), Ms. Rumpf clearly and unambiguously agreed to release Sunlight.  Indeed, Ms. Rumpf testified that she read and agreed to this release.  (MSMF ¶¶ 9-10.)

The language used in the Liability Release Agreement is comparable to the language upheld in *Jones v. Dressel*, which contained stronger language than that upheld in *Heil*.  The court in *Jones* upheld the entry of summary judgment against a skydiver who was injured in an airplane accident on the basis of a one-paragraph "exemption from liability" which read as follows:

> 2A. EXEMPTION FROM LIABILITY. The (plaintiff) exempts and releases the Corporation, its, owners, officers, agents, servants, employees, and lessors from any and all liability, claims, demands or actions or causes of action whatsoever arising out of any damage, loss or injury to the (plaintiff) or the (plaintiff's) property while upon the premises or aircraft of the Corporation or while participating in any of the activities contemplated by this Agreement, whether such loss, damage, or injury results from the negligence of the Corporation, its officers, agents, servants, employees, or lessors or from some other cause.

*Jones*, 623 P.2d at 372.

The Liability Release Agreement executed by Ms. Rumpf follows the release approved in *Jones* in that it (i) uses the term "release," (ii) broadly describes the types of matters released, (iii) specifically refers to the "negligence" of the released parties, and (iv) expressly applies to "all" injuries resulting from participation in the activity in issue.  (*See* Ex. 2.)

In fact, language in the Liability Release Agreement is in bold, (*id.*), whereas the language in the *Jones* release was not.  Moreover, the Liability Release Agreement contains several paragraphs, not just one, which explained the nature and scope of the release.  (*Id.*)  Thus, it is stronger than both the *Jones* and *Heil* release, upheld by the Colorado Supreme Court.

Furthermore, Ms. Rumpf agreed to the language in the Lift Ticket Agreement.  (MSMF ¶¶ 14-15.)  As such, she agreed "to **ASSUME ALL RISKS** associated with the activities and to **HOLD HARMLESS** the Ski Area and its representatives for all claims for injury to person or property." (Ex. 4; MSMF ¶¶ 13, 15.)  As such, Ms. Rumpf has waived her and her husband's claims as a matter of law.[4]

## II.   PLAINTIFFS' CLAIMS FAIL FOR A LACK OF EXPERT TESTIMONY

Plaintiffs have disclosed no expert witnesses, at all, on any liability issue.  (MSMF ¶¶ 47, 49.)  Their failure to disclose expert witnesses as to the proper standard of care by Sunlight and the breach of such standard of care is fatal to their claims, as addressed first below.  Similarly, they have no admissible evidence to rebut that the admitted negligence *per se* of Ms. Rumpf, which the admissible evidence demonstrates was the cause of the accident.

### A.   Plaintiffs' Have No Expert Witnesses on the Operation of a Ski Lift, and as Such, Have No Admissible Evidence on Either the Standard of Care or Any Failure to Adhere to Such a Standard

Expert testimony is required to establish both the standard of care when the standard is outside the common knowledge and experience of ordinary persons, and the defendant's failure to adhere to that standard of care.  *Sussman v. Stoner*, 143 F. Supp. 2d 1232, 1240 (D. Colo. 2001) ("[U]nless the alleged negligence concerns subject matter within the common knowledge

---

[4] As Mr. Rumpf's claim is derivative of Ms. Rumpf's claims, if Ms. Rumpf's claim fails his must as well.  *Covert v. Allen Group, Inc.*, 597 F. Supp. 1268, 1270 (D. Colo. 1984) ("Since each of Richard Covert's tort claims has been dismissed, Ruth Covert's derivative claim for loss of consortium must also be dismissed."); *Schwindt v. Hershey Foods Corp.*, 81 P.3d 1144, 1148 (Colo. App. 2003).  In addition, Mr. Rumpf agreed to the same releases.  (MSMF ¶ 8; Ex. 3.)

or experience of an ordinary person, both the standard of care and the defendant's failure to

adhere to that standard must be established by the expert opinion testimony of a qualified expert

witness."); *see also Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913, 929-930 (Colo. 1997),

*as modified on denial of reh'g* (Oct. 20, 1997).

Plaintiffs argue that Sunlight breached its ski lift operation duties with regards to the

accident, yet they have endorsed no expert witnesses regarding ski lift operations and as such do

not provide any admissible evidence regarding what is proper or improper with regards to lift

operations.  It is well established that expert testimony is necessary to establish whether a ski

area breached its duty of care.  *Kidd v. Taos Ski Valley, Inc.*, 88 F.3d 848, 853 (10th Cir. 1996)

(affirming summary judgment where plaintiff failed to set forth expert evidence on propriety of

ski area's placement of ropes); *Callister v. Snowbird Corp.*, 2014 UT App 243, ¶ 19, 337 P.3d

1044, 1050, *cert. denied*, 343 P.3d 708 (Utah 2015) (affirming summary judgment where

plaintiff failed to set forth expert evidence on ski area's failure to keep guest from being struck

by ski lift); *MacDonald v. Ski Sundown, Inc.*, No. X07CV020083292S, 2005 WL 1089154, at *2

(Conn. Super. Ct. Mar. 31, 2005) (whether a snow ramp at a ski area was constructed and

maintained in a reasonably safe manner requires expert testimony); *Civitello v. Ski Sundown,

Inc.*, No. CV 970137455S, 2000 WL 804598, at *2 (Conn. Super. Ct. June 9, 2000) (propriety of

ski instructor's actions requires expert testimony).

This issue was recently addressed in Utah, where the appellate court held that "in

negligence cases against ski resorts and related industries with specialized equipment and

operations, expert testimony is required because an average person would not have knowledge of

standards of care in those industries and thus would be 'forced to speculate about how a

<u>reasonable [ski resort operator] would act</u>.'" *Callister*, 2014 UT App 243, ¶ 19, 337 P.3d at 1050 (emphasis added, alteration in original, citations omitted).

The Tenth Circuit has provided direct guidance on this issue, albeit under New Mexico law. In *Kidd v. Taos Ski Valley, Inc.*, the Tenth Circuit held that where the plaintiff alleged a breach of the New Mexico Ski Safety Act, which adopted NSAA standards, the absence of expert evidence by the plaintiff was fatal to her claim. *Kidd*, 88 F.3d at 853. As the Tenth Circuit explained:

> We agree with the district court's findings that Kidd produced "[o]nly speculation, <u>not expert testimony</u> ... in attempting to rebut Defendant's submitted compliance with the Act" and that "<u>the record [is] absent of competent evidence that the closure fell outside industry norms</u> established by NSAA standards…."

*Id.*, 88 F.3d at 853 (emphasis added; alterations in original; citation omitted). Similar to how the New Mexico Ski Safety Act adopted NSAA standards in the *Kidd* case, here the Colorado Ski Safety Act follows the Passenger Safety Tramway Act, *see* C.R.S § 33-44-102, -103(5)(7), -104(2), and the Passenger Safety Tramway Act follows much of the ANSI B77.1 standards. *See* C.R.S. § 25-5-704(1)(a); 3 CCR 718-1, Rule 0.1.

Sunlight's specially retained expert, Chris Stoddard, who is the chairperson of the ANSI B77.1 operations and signage subcommittees, has opined that Sunlight (i) did not breach its duty of care and (ii) did not violate the ANSI B77.1 standards. (*See* Stoddard Decl. ¶ 16.) As Plaintiffs have no expert witnesses on liability, they have no admissible evidence to the contrary. As the Tenth Circuit has explained, they can only produce "speculation, not expert testimony," which is insufficient to survive summary judgment. *Kidd*, 88 F.3d at 853.

Whether a ski area operator meets the standard of care for the operation of ski lifts, regardless of the application of ANSI B77.1, is far outside the common knowledge and experience of ordinary persons. This has been well established by the few courts that have

squarely addressed the issue. *E.g., Willink v. Boyne USA, Inc.*, 987 F. Supp. 2d 1082, 1084 (D. Mont. 2013) ("Whether or not a chairlift complies with current standards—which admittedly include ANSI B77.1—in terms of construction and operation is not readily ascertainable to a lay person."); *Callister*, 2014 UT App 243, ¶ 19, 337 P.3d at 1050 (quoted above, affirming summary judgment where plaintiff failed to set forth expert evidence on ski area's failure to keep guest from being struck by ski lift); *Cowan v. Tyrolean Ski Area, Inc.*, 127 N.H. 397, 400-01, 506 A.2d 690, 693 (1985) (in the context of a ski lift accident, "this was a case requiring expert testimony to establish that the accident was of a sort that ordinarily would not have occurred without negligence;" and "the mechanics of ski lifts are outside common experience, and jurors would need the benefit of expert testimony before they could reasonably eliminate all probable causal negligence but that of the defendant-operator").

Neither Ms. Rumpf nor Mr. Rumpf have ever worked in lift operations, so neither can speak to the propriety or impropriety of Sunlight's actions. (MSMF ¶ 48.) More importantly, Plaintiffs have designated no experts to speak about the propriety or impropriety of Sunlight's operation. Rather, the only designated experts on this issue in the case – the only people who can talk about propriety of lift operations in general, and compliance with ANSI standards specifically, are Messrs. Stoddard and Terry, both of whom explain that Sunlight's actions were proper. (MSMF ¶ 50; *see also* Stoddard Decl. ¶¶ 13-16; Terry Decl. ¶¶ 24-26.)

Ms. Rumpf's primary allegation is that after she skied out over four and a half feet too far, (MSMF ¶ 35), Sunlight's employees acted improperly in trying to get her out of the potential zone of danger she placed herself in by shouting to her to get to the load here location. (Compl. ¶¶ 9 ("Sunlight's lift attendant suddenly and forcefully shouted "Go! Go! Go!," in an apparent attempt to keep [the] lift loaded. Obeying Sunlight's <u>negligently</u> <u>shouted</u> <u>instructions</u> . . ."), 24

(Sunlight "breached its duty of care to the Rumpf by failing to <u>properly</u> <u>operate</u> <u>its</u> <u>ski</u> <u>lift</u> and by <u>failing</u> <u>to</u> <u>properly</u> <u>instruct</u> the Rumpfs at the ski lift loading area"), 29 ("Sunlight's employees violated the SSA by providing <u>negligent</u> <u>verbal</u> <u>instructions</u> that directed Mrs. Rumpf to attempt to board the lift . . .") (emphasis added) (Dkt. No. 1); *see also* Sch. Order at 2-3 (Dkt. No. 18).)[5] But she provides no expert evidence at all to support the proposition that these decisions in operation of the ski lift were negligent.

Rather, the undisputed expert evidence is that the zone she skied into is hazardous because it has the potential to put her in the path of fixed grip chairs approaching at 500 feet per minute. (Stoddard Decl. ¶ 11.) Encouraging Ms. Rumpf to go was the proper operational decision under the circumstance, (Stoddard Decl. ¶¶ 13-14; Terry Decl. ¶ 24; *see also* MSMF ¶ 37), and Plaintiffs have no admissible evidence to the contrary.

The need for expert testimony is aptly demonstrated by Plaintiffs' side suggestion of negligence. Plaintiffs suggest, without any admissible evidence, that Sunlight should have stopped Ms. Rumpf from going further, instructed her to back up, or slowed the lift. However, proper operation procedure at this point is to encourage the guest to move as quickly to the load

---

[5] Plaintiffs have also, in passing, contended that after Ms. Rumpf's fall, one of Sunlight's employees improperly tried to move Ms. Rumpf. (Compl. ¶ 12; *but see* Sch. Order at 2-3 (only alleging a failure "to properly operate its ski lift and by failing to properly instruct the Rumpfs" without any allegations about improperly moving Ms. Rumpf).) However, as Plaintiffs have set forth no evidence that such an alleged action exacerbated her injuries in any way, (Ex. 10; *see also* MSMF ¶ 49), this allegation cannot support their claims. *See* C.J.I. Civ. 9:1 (essential elements of negligence claims include causation and damages). While a "plaintiff need not prove with absolute certainty that the defendant's conduct caused the plaintiff's harm," the plaintiff "must establish causation beyond mere possibility or speculation." *Kaiser Foundation Health Plan of CO v. Sharp*, 741 P.2d 714, 719 (Colo. 1987); *accord Anderson v. Pelt*, C.A. No. 09-cv-00704-CMA-KMT, 2010 WL 5109994 (D. Colo. Dec. 8, 2010). And, such evidence on exacerbation of injuries would necessarily involve expert evidence, Plaintiffs themselves would only be speculating whether any subsequent actions within minutes of the initial accident would have exacerbated her injuries. As Plaintiffs have no such evidence, (Ex. 10; *see also* MSMF ¶ 49), this allegation has no bearing on this matter.

here board as possible.  (Stoddard Decl. ¶¶ 13-14; Terry Decl. ¶ 24; *see also* MSMF ¶ 37.)

Contrary to Plaintiffs' expert-less opinion, asking a skier to back-up is not practical.  (MSMF ¶

39.)  Plaintiffs likewise claim that "no attempt was made by the male lift attendant to slow down

the lift," (S. Rumpf's Supp. Disc. Resp. at 9, Ex. 12), yet the design of a lift does not provide

sufficient time to slow the lift in these circumstances.  (MSMF ¶ 38.)

Simply, Plaintiffs' accusations of negligence that are contrary to the actual operation of

ski lifts, demonstrate the necessity of expert testimony.  The proper operation of a ski lift is not

within the common knowledge and experience of ordinary people.  Likewise, the meaning and

application of the relevant ANSI standards is not simply not something that is part of the

common knowledge and experience of ordinary people – few jurors have heard of the ANSI

standards, let alone know what the standards mean or how they relate to ski lifts.  Likewise, the

propriety of Sunlight's operational decisions in the fluid situation where a guest violates their

duties (as Ms. Rumpf concedes she did) by both (i) skiing over four and a half feet to far, and (ii)

looking the wrong way as the chair component approached, are not issues within the common

knowledge or experience of an ordinary person.  As such, Plaintiffs' have failed to adduce

admissible evidence necessary to support their claims.

**B.      The Undisputed Facts Demonstrate that Ms. Rumpf Was Negligent Per Se, and Plaintiffs Cannot Rebut that the Plaintiffs' Fault Caused the Accident**

Sunlight has asserted that this accident was Ms. Rumpf's fault.  (*E.g.*, Answer (Dkt. 12)

at 5 ¶ 2.)  The undisputed facts demonstrate that Ms. Rumpf was negligent *per se*.  Pursuant to

the Ski Safety Act, a "passenger is required to follow any written or verbal instructions that are

given to him regarding the use of the passenger tramway." C.R.S. § 33-44-105(1); *accord*

C.R.S. § 33-44-109(5) ("Each skier has the duty to heed all posted information …."); *see also*

ANSI B77.1 § 4.3.6.3.  It is undisputed Sunlight provided a written instruction at the base of the

lift that stated: "CENTER POLE CHAIR LOOK TO THE INSIDE." (MSMF ¶ 31.) Per statute, "[e]ach skier has the duty to heed all posted information and other warnings." C.R.S. § 33-44-109(5). It is undisputed that Ms. Rumpf read this instruction. (MSMF ¶ 32); *see also* C.R.S. § 33-44-109(5) ("Each skier shall be presumed to have seen and understood all information posted in accordance with this article near base area lifts [and] on the passenger tramways …."). And, it is undisputed that Ms. Rumpf did not follow this instruction. (MSMF ¶ 41; *see also id.* ¶ 42.) As such, her actions constituted negligence *per se*. C.R.S. § 33-44-104(1).

The only question, therefore, is whether Ms. Rumpf's failure to look to the center pole caused the accident. Ms. Rumpf cannot speak to this – not only was she not a designated expert witness – she has no experience or expertise with this lift and whether people are able to load it if they properly follow the instruction to look in to the center pole. Rather, the only expert evidence in this case is that had Ms. Rumpf looked to the center pole, she would not have been injured. (MSMF ¶ 44.)

Not only do the undisputed facts demonstrate that Ms. Rumpf was negligent *per se*, even if Sunlight would have to show under a comparative fault analysis that Ms. Rumpf was likewise negligent, it has demonstrated this through expert testimony. (Terry Decl. ¶ 26.) As Mr. Terry, a former ski patroller who now runs Sunlight's lift department and is Sunlight's designated agent for the Colorado Passenger Tramway Board explained:

> They came to a load station, they both admit that they didn't stop at the "wait here" board together. They started and stopped. They looked over the wrong shoulder. Everybody is in agreement with that. . . . That tells me that they're not prepared to load that lift. . . .
> The signage at the lift[,] and the Colorado Skier Safety Act, the ANSI B77 all state that the – the guest has the obligation and the responsibility to know how to load a lift, to stop and observe the lift, and to understand what it takes, and the ability, the dexterity, the timing, and everything involved to load a lift. By her own admission and Mr. Rumpf's admission, they did not do that.

(Terry Dep. at 29:14-21; 30:11-18.)

21

Even if Plaintiffs could show a breach by Sunlight, which they could not do as they could not locate an expert who would support their untenable position, Plaintiffs would still need to rebut the evidence that their actions were negligent.  *See* C.R.S. § 13-21-111(1) (in order to recover, Plaintiffs' negligence cannot be "as great as the negligence of" Sunlight).  Plaintiffs have not done this, however, as Sunlight's unrebutted expert evidence is that Plaintiffs' actions, not Sunlight's actions, were negligent (and negligent *per se*).

## CONCLUSION

Sunlight is entitled to judgment as a matter of law for multiple independent reasons.  The undisputed facts demonstrate that Plaintiffs released their claims against Sunlight.  Furthermore, Plaintiffs have failed to adduce any expert evidence that Sunlight failed to follow the ANSI B77.1 standards or any other duties it had, which likewise mandates a dismissal of their claims.  Finally, absent proper evidence to the contrary, the undisputed facts demonstrate that Plaintiffs' negligence was the cause of the accident.  For the foregoing reasons, Sunlight respectfully requests that the Court grant its motion for summary judgment and dismiss all of Plaintiffs' claims with prejudice.

Dated: November 2, 2015.

*s/ Jordan Lipp*
Jordan Lipp
DAVIS GRAHAM & STUBBS LLP
1550 17th Street, Suite 500
Denver, CO 80202
Telephone:  303.892.9400
Facsimile: 303.893.1379
Email: Jordan.Lipp@dgslaw.com
Attorneys for Defendant SUNLIGHT, INC.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** was served via **CM/ECF** e-file system on this 2nd day of November, 2015, addressed to the following:


Aric Stock
STROMBERG STOCK, PLLC
Aric@strombergstock.com

Michael G. Brownlee
Michael@brownleelawllc.com



*<u>s/ Paige Finnell</u>*
Paige Finnell


***This document was filed and served via the CM/ECF e-file system. The originally signed copy is on file at the offices of Davis Graham & Stubbs LLP.***